**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| EXPRESS WORKING CAPITAL, LLC, | § | |
| | § | |
| Plaintiff, | § | |
| | § | 3:13-CV-3045-O |
| v. | § | |
| | § | |
| STARVING STUDENTS, INC., ET AL., | § | |
| | § | |
| | § | |
| Defendant. | § | |

**DEFENDANTS' BRIEF IN SUPPORT OF
MOTION FOR PARTIAL SUMMARY JUDGMENT**

**Submitted by:**

Toby M. Galloway
State Bar No. 00790733
Colleen M. Deal
State Bar No. 24082909
KELLY HART & HALLMAN LLP
201 Main Street, Suite 2500
Ft. Worth, Texas  76102
(817) 332-2500 (phone)
(817) 878-9727 (fax)
toby.galloway@kellyhart.com (email)

*Attorneys for Defendants*

## TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES .................................................................................................

I.     INTRODUCTION AND SUMMARY OF ARGUMENT .................................................1

II.    GROUNDS FOR SUMMARY JUDGMENT ..................................................................1

III.    EVIDENCE ESTABLISHING SSI'S RIGHT TO SUMMARY JUDGMENT.................2

IV.    FACTUAL BACKGROUND ...........................................................................................3

V.    ARGUMENTS AND AUTHORITIES............................................................................6

     A.    Summary Judgment Standard .............................................................................6

     B.    EWC Extended A Series of Usurious Loans to SSI Under the Guise of Purchasing Alleged "Future Receivables" .........................................................7

          1.    EWC Loaned Money to SSI ....................................................................7

               a.    The Agreements do not contemplate "account purchase transactions" as those transactions are defined by the Texas Finance Code ................................9

               b.    EWC did not operate or manage the transactions as if they were account purchase transactions......................................9

               c.    EWC took a security interest in all of SSI's assets —not just the "future receivables"..................................11

               d.    EWC considered only SSI's creditworthiness and ignored the creditworthiness of SSI's customers...........................11

               e.    SSI bore all of the risk of non-performance...................................12

          2.    SSI Had an Absolute Obligation to Repay the Principal to EWC ............15

          3.    EWC Contracted For Interest Exceeding the Legal Limit........................17

     C.    SSI Is Entitled To Damages in Connection With the Usurious Interest...............18

     D.    Having Established its Usury Defense as a Matter of Law, SSI Is Not Liable to EWC for Breach of Contract ..............................................................19

## TABLE OF CONTENTS (cont.)

<u>PAGE</u>

E.   If SSI is Not Liable Under the Agreements, SSI and Margalith are
     Not Liable Under Any Legal Theory Advanced by EWC ....................................19

VI.   CONCLUSION AND REQUEST FOR RELIEF ............................................................20

CERTIFICATE OF SERVICE .......................................................................................................22

## TABLE OF AUTHORITIES

**CASES**                                                                                                        **PAGE**

*84 Lumber Co., L.P. v. Powers*,
393 S.W.3d 299 (Tex. App.—Houston [14th Dist.] 2012, pet. denied) .......................................20

*Anglo-Dutch Petroleum Int'l, Inc. v. Haskell*,
193 S.W.3d 87 (Tex. App.—Houston [1st Dist.] 2006, pet. denied)................................................7

*ATC Healthcare Servs., Inc. v. New Century Fin., Inc.*,
No. 01-10-00940-CV, 2011 WL 2739540
(Tex. App.—Houston [1st Dist.] July 14, 2011, no pet.)............................................................10

*Bistro Exec., Inc. v. Rewards Network, Inc.*,
No. CV-04-4640 CBM, 2006 WL 6849825 (C.D. Cal. July 19, 2006)..........................................5

*Bray v. McNeely*,
682 S.W.2d 615 (Tex. App.—Houston [1st Dist.] 1984, no writ)................................................8

*Brumfield v. Hollins*,
551 F.3d 322 (5th Cir. 2008) .............................................................................................6

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986).........................................................................................................6

*ECE Techs. Inc. v. Cherrington Corp.*,
168 F.3d 201 (5th Cir. 1999)......................................................................................7, 17

*Endico Potatoes, Inc. v. CIT Grp./Factoring, Inc.*,
67 F.3d 1063 (2d Cir. 1995)............................................................................................12

*English v. Fischer*,
660 S.W.2d 521 (Tex. 1983)...........................................................................................20

*First Bank v. Tony's Tortilla Factory, Inc.*,
877 S.W.2d 285 (Tex. 1994)............................................................................................7

*First USA Mgmt., Inc. v. Esmond*,
960 S.W.2d 625 (Tex. 1997)........................................................................................7, 8

*Fletcher v. Edwards*,
26 S.W.3d 66 (Tex. App.—Waco 2000, pet. denied).............................................................19

*Gonzales Cnty. Sav. & Loan Ass'n v. Freeman*,
534 S.W.2d 903 (Tex. 1976).........................................................................................17

## <u>TABLE OF AUTHORITIES (cont.)</u>

<u>CASES</u>                                                                                                  <u>PAGE</u>

*Haase v. Glazner*,
62 S.W.3d 795 (Tex. 2001).............................................................................................20

*Henning v. OneWest Bank FSB*,
405 S.W.3d 950 (Tex. App.—Dallas 2013, no pet.)....................................................19

*In re Deepwater Horizon*,
728 F.3d 491 (5th Cir. 2013) .........................................................................................15

*Jackson v. Cassidy*,
4 S.W. 541 (Tex. 1887)....................................................................................................9

*Johns v. Jaeb*,
518 S.W.2d 857 (Tex. Civ. App.—Dallas 1974, no writ) .............................................7

*Korrody v. Miller*,
126 S.W.3d 224 (Tex. App.—San Antonio 2003, no pet.)............................................8

*Maxwell v. Bankston's Estate*,
433 S.W.2d 229 (Tex. Civ. App.—Texarkana 1968, no writ)................................7, 17

*Mims v. Fid. Funding, Inc.*,
307 B.R. 849 (N.D. Tex. 2002).......................................................................................7

*Nagle v. Nagle*,
633 S.W.2d 796 (Tex. 1982)..........................................................................................19

*Najarro v. SASI Int'l, Ltd.*,
904 F.2d 1002 (5th Cir. 1990) ..................................................................................7, 17

*Pickrell v. Alpha Pipe & Steel, Inc.*,
406 S.W.2d 956 (Tex. Civ. App.—Amarillo 1966, writ ref'd n.r.e.)............................8

*Reaves Brokerage Co. v. Sunbelt Fruit & Vegetable Co.*,
336 F.3d 410 (5th Cir. 2003) ...........................................................................7, 11, 14

*Republic Nat'l Bank of Dallas v. Nw. Nat'l Bank of Fort Worth*,
578 S.W.2d 109 (Tex. 1978)..........................................................................................15

*Skeen v. Slavik*,
555 S.W.2d 516 (Tex. Civ. App.—Dallas 1977, writ ref'd n.r.e.) ...............................17

# TABLE OF AUTHORITIES (cont.)

**CASES**                                                                                                **PAGE**

*Sterling Prop. Mgmt., Inc. v. Tex. Commerce Bank, Nat'l Ass'n,*
32 F.3d 964 (5th Cir. 1994) ...........................................................................................7, 8

*Sturm v. Muens,*
224 S.W.3d 758 (Tex. App.—Houston [14th Dist.] 2007, no pet.)..............................17

*Tex. Tool Traders v. W. E. Grace Mfg. Co.,*
488 S.W.2d 498 (Tex. Civ. App.—Dallas 1972, writ granted) .......................................8

*Trammell Crow Residential Co. v. Virginia Sur. Co.,*
643 F. Supp. 2d 844 (N.D. Tex. 2008) ........................................................................19

*Univ. Metals & Machinery, Inc. v. Bohart,*
539 S.W.2d 874 (Tex. 1976)........................................................................................20

**RULES AND STATUTES**

FED. R. CIV. P. 56 ..........................................................................................................6

Tex. Fin. Code § 301.002(a)(4) ...................................................................................17

Tex. Fin. Code § 302.001(b)..........................................................................................18

Tex. Fin. Code § 302.002(a)(1) ......................................................................................7

Tex. Fin. Code § 305.001..........................................................................................17, 19

Tex. Fin. Code § 305.003(a)(1) .....................................................................................19

Tex. Fin. Code § 305.004(a) ..........................................................................................19

Tex. Fin. Code § 306.001(1)............................................................................................9

Tex. Fin. Code § 306.103(b)............................................................................................8

## DEFENDANTS' BRIEF IN SUPPORT OF
## MOTION FOR PARTIAL SUMMARY JUDGMENT[1]

## I.
## INTRODUCTION AND SUMMARY OF ARGUMENT

Defendants Starving Students, Inc. ("SSI") and Ethan Margalith are not liable to Plaintiff Express Working Capital, LLC ("EWC") for breach of contract because the undisputed facts demonstrate that the financing arrangements at issue are usurious loans. In addition, even though EWC asserts three purported extra-contractual claims, all of EWC's alleged damages for these claims are contractual in nature. Because SSI is entitled to summary judgment on EWC's contractual claim, EWC is unable to establish any damages for its other claims, which must therefore be dismissed. Furthermore, as a matter of law, Margalith is not liable on his personal guarantee, because under the unlawful contracts, there is no obligation that is guaranteed. Finally, because EWC contracted for interest of more than double the statutory rate, SSI is entitled to damages equal to all principal and interest plus attorney fees.

## II.
## GROUNDS FOR SUMMARY JUDGMENT

As a matter of law, SSI's usury defense bars EWC's breach-of-contract claim (which also defeats EWC's remaining claims for damages), and SSI's usury counterclaim entitles it to damages. The undisputed summary judgment record establishes that:

1. There is no genuine issue of material fact that EWC loaned money to SSI.

2. There is no genuine issue of material fact that SSI (and Ethan Margalith as a personal guarantor of the loans) had an absolute obligation to repay the principal.

3. There is no genuine issue of material fact that EWC contracted for, charged, or received interest of more than twice the maximum amount allowed by law.

---

[1] Defendants' motion is one for partial summary judgment because the only counterclaim on which they seek summary judgment is usury. But if this motion is granted, all of Plaintiff's claims will be dismissed. At that time, Defendants will evaluate whether to proceed with their remaining claims.

4.      There is no genuine issue of material fact that if the loans are usurious, Plaintiff's claims for fraud, fraudulent inducement, promissory estoppel, and breach of Margalith's personal guarantee also fail.

### III.
### EVIDENCE ESTABLISHING SSI'S RIGHT TO SUMMARY JUDGMENT

SSI filed a separate Appendix of Evidence in Support of its Motion for Partial Summary Judgment.  The appendix contains the following evidence, which is incorporated by reference:

| **Exhibit** | **Page(s)** | **Description** |
|---|---|---|
| A | 1-3 | Second Declaration of Ethan Margalith |
| B | 4-78 | Future Receivables Sale Agreements |
| C | 79-85 | UCC Filings |
| D | 86-232 | Bruce Ross Report |
| E | 233-237 | July 25, 2013 to EWC from Anat Lavy |
| F | 238-240 | EWC's Deal Blueprint |
| G | 241-297 | Intelliscore Plus Results for SSI |
| H | 298-311 | Excerpts from Deposition Testimony of Joe Womack |
| I | 312-318 | Excerpts from Deposition Testimony of Bradley Woy |
| J | 319-324 | Excerpts from Deposition Testimony of Jean Fria |
| K | 325-326 | Texas Finance Code § 305.001 |
| L | 327-328 | Texas Finance Code § 305.004 |
| M | 329-330 | Texas Finance Code § 305.005 |

# IV.
## FACTUAL BACKGROUND

SSI is a California moving company founded in 1973 by Ethan Margalith after high school.[2]  Virtually all of SSI's revenue comes from credit-card income directed to SSI by its credit-card processor.[3]  Recently, however, SSI has suffered financial distress due to the usurious interest rates that SSI has been forced to pay EWC.

Bradley Woy founded EWC in 2007, after serving time in federal prison for securities fraud.  EWC is in the business of providing working capital loans to businesses at astronomical effective interest rates.  Although EWC and Woy label EWC's predatory lending transactions as purchases of "future receivables,"[4] no actual receivables are identified in the Agreements. Instead, EWC demands repayment from "receivables" that have yet to come into existence.

In this case, EWC loaned SSI amounts in a series of ten transactions, confirmed in writing by "Future Receivables Sale Agreements" dated from May 9, 2011, through July 11, 2013 (collectively, the "Agreements").[5]  EWC secured these loans by UCC-1 filings that placed liens on all of SSI's assets, including all of its tangible personal property, intangible property, and the like.[6]  The Agreements provided for EWC to receive a set percentage of SSI's cash flow from *future* credit card income *not yet in existence* in exchange for a "Purchase Price" substantially below the alleged "Amount Sold."[7]

The Agreements provided for an advance of money dubbed the "Purchase Price" – the price at which EWC purported to purchase future accounts receivable from SSI.  In turn, SSI was obligated to repay the "Amount Sold," defined as the "dollar value of the Future Receivables

---

[2] [App. 2, ¶ 3].
[3] [*Id.* at 3, ¶ 7].
[4] [*See, e.g., id.* at 5-78].
[5] [*See id.*].
[6] [*Id.* at 80-85].
[7] [*Id.* at 5, 11, 17, 23, 31, 39, 47, 55, 63, 71].

being sold." To illustrate, in the first agreement, EWC paid a Purchase Price of $500,000 (the amount advanced) in exchange for a repayment of $685,000 (the purported "Amount Sold"). Embedded within the Amount Sold was what EWC terms a "fee" or "discount." SSI, however, calls this extra $185,000 what it is: interest. Put another way, the term "Purchase Price" constitutes the advance of principal by EWC to SSI, and "Amount Sold" is the total amount of principal and imputed interest to be repaid by SSI to EWC.

The Agreements required SSI to cease using National Merchant Center ("NMC") as its credit-card processor and, instead, use EWC's preferred credit-card processor, Fortis Payment Systems ("Fortis").[8] Additionally, EWC prohibited SSI from changing its credit-card processor without obtaining EWC's prior consent.[9]

EWC also required SSI to sign EWC's form agreement.[10] The Agreements called for Ethan Margalith to personally guarantee repayment in the event of any breach by SSI.[11] More specifically the "Guarantor(s)" provision states that "[i]n the event [SSI] breaches this Agreement in *any manner*, each Guarantor listed on the signature page of this Agreement is *fully liable* to [EWC]."[12] Closing SSI's business or changing its credit card processor constitutes a breach of the Agreements—a fact made clear in bold print on the first page of the Agreements.[13]

In the event of a breach, the Agreements grant EWC remedies that signify SSI's absolute obligation to repay EWC. The Agreements provide:

> In the event [SSI] breaches, or defaults under, any of the provisions of this Agreement, . . . *the entire outstanding Amount Sold shall become immediately due and payable by [SSI] to [EWC]* and [EWC] shall be entitled to all remedies available under law and equity. In the event of a breach or default by [SSI], . . .

---

[8] [*Id.* at 2, ¶ 5].
[9] [*Id.* at 7, 13, 19, 25, 33, 41, 49, 57, 65, 73, ¶ 7].
[10] [*Id.* at 5-78; 311, 187:2-14].
[11] [*Id.* at 9, 15, 21, ¶ 21; 29, 37, 45, 53, 61, 69, ¶ 28].
[12] [*See, e.g., id.* at 29, 37, 45, 53, 61, 69, ¶ 28 (emphasis added)].
[13] [*Id.* at 5, 11, 17, 23, 31, 39, 47, 55, 63, 71].

> [EWC] may automatically debit from any of [SSI's] bank accounts, via the ACH or otherwise, all or any portion of the outstanding Amount Sold or may instruct Processor to forward to [EWC], ***without prior notice to [SSI]***, all or any portion of the outstanding Amount Sold.  In addition to the foregoing, . . . [EWC] shall have the right, without notice to [SSI], to enter upon the premises of any or all of [SSI's] business locations and take over the operation and/or control of [SSI's] business . . . and ***direct all of the proceeds from the operations of [SSI's] business until the outstanding Amount Sold are [sic] remitted to and received by [EWC]***.[14]

Thus, through this self-help provision alone, EWC contracts for, charges, and may receive more than twice the legal limit on interest.

After executing the final agreement on July 11, 2013 (which called for exorbitant

Despite their misleading labels, these Agreements are loans, and SSI is required to pay EWC interest under the Texas Finance Code.  This interest, when calculated as a percentage of the so-called "advance" or "Amount Sold," is more than twice the legal limit in Texas.  Before SSI informed EWC it would no longer be held hostage by such predatory lending tactics, SSI was paying an average effective interest rate approaching 100%.[15]  Furthermore, the effective interest rate on each of the ten loans was more than twice the legal limit.

After executing the final agreement on July 11, 2013 (which called for exorbitant remittance payments to EWC of 13.75% each day),[16] SSI learned from Anat Levy, Esq., that the Agreements were illegal under Texas law.[17]  SSI, knowing that Ms. Levy had won usury lawsuits against two other predatory lenders in the so-called merchant cash advance industry, placed great trust in her opinion.[18]  Accordingly, on or about July 22, 2013, SSI ceased working with Fortis and returned to using NMC as its processor.[19]  Then, by letter dated July 25, 2013, Ms. Levy

---

[14] [*See, e.g., id.* at 28, 36, 44, 52, 60, 68, 76, ¶ 18 (emphasis added)].

[15] [*Id.* at 87-232, 92].

[16] [*Id.* at 71].

[17] [*Id.* at 3, ¶ 6].

[18] *See, e.g., Bistro Exec., Inc. v. Rewards Network, Inc.*, No. CV-04-4640 CBM, 2006 WL 6849825 (C.D. Cal. July 19, 2006); [App. 321-24, 29:2-6, 76:14-23, 156:16-157:17].

[19] [*Id.* at 3, ¶ 6].

notified EWC's counsel that the Agreements were usurious and that SSI would no longer repay the illegal loans.[20]

On August 5, 2013, EWC filed its complaint, seeking to recover, among other things, "all amounts due and owing pursuant to the Agreement[s]."[21]   In essence, EWC has sued SSI and Margalith based on their absolute obligation to repay the principal (i.e., the "Purchase Price"), plus interest (the amount added to the "Purchase Price" to make up the "Amount Sold").   But at the same time as EWC has demanded "all amounts due and owing" in connection with an absolute repayment obligation under the Agreements, it has also insisted that they are not loans. EWC cannot have it both ways. Therefore, SSI respectfully requests that this Court reject the self-serving label that EWC stamped on its form agreements and find that the Agreements amount to illegal loans, thereby warranting summary judgment on SSI's usury defense and counterclaim.

## V.
## ARGUMENTS AND AUTHORITIES

### A.   Summary Judgment Standard.

Federal Rule of Civil Procedure 56 provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[22]   The movant  bears the burden of proof that a motion for summary judgment should be granted.[23]   The movant meets its burden by informing the court of the reason for its motion and by identifying the portions of the record that reveal the absence of genuine material fact issues.[24]    Here, SSI seeks summary judgment on its

---

[20] [*Id.* at 3, 234-37].
[21] [Compl., ECF No. 2].
[22] FED. R. CIV. P. 56(a); *see also Brumfield v. Hollins*, 551 F.3d 322, 326 (5th Cir. 2008).
[23] *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).
[24] *Id.*; *see* FED. R. CIV. P. 56.

counterclaim and affirmative defense of usury, and all of Plaintiff's claims. Likewise, Margalith seeks summary judgment on all of Plaintiff's claims against him.

## B. EWC Extended A Series of Usurious Loans to SSI Under the Guise of Purchasing Alleged "Future Receivables."

SSI is entitled to summary judgment on its usury claim and defense because the undisputed facts demonstrate "(1) a loan of money; (2) an absolute obligation to repay the principal; and (3) the exaction of a greater compensation than allowed by law for the use of the money by the borrower."[25]

### 1. EWC Loaned Money to SSI.

The Texas Finance Code defines "loan" as "an advance of money that is made to or on behalf of an obligor, the principal amount of which the obligor has an obligation to pay the creditor."[26]  Under that definition, EWC cannot credibly deny that it loaned money to SSI.[27]

In deciding whether a transaction is a loan, courts consider the totality of the circumstances and the intentions of the parties.  "[W]hether an amount of money is compensation for the use of money depends not on what the parties call it, but on the substance of the transaction."[28]  Thus, the totality of the circumstances must be considered even though the Agreements purport to govern the purchase of "future receivables."

---

[25] *See Mims v. Fid. Funding, Inc.*, 307 B.R. 849, 855-56 (N.D. Tex. 2002) (citing *First Bank v. Tony's Tortilla Factory, Inc.*, 877 S.W.2d 285, 287 (Tex. 1994)).

[26] Tex. Fin. Code § 302.002(a)(1); *see also Anglo-Dutch Petroleum Int'l, Inc. v. Haskell*, 193 S.W.3d 87, 96 (Tex. App.—Houston [1st Dist.] 2006, pet. denied).

[27] Put another way, "[w]hen money is advanced to enable one to engage in a business venture with the understanding that the advance and an added amount are to be returned, there is a loan." *Johns v. Jaeb*, 518 S.W.2d 857, 859 (Tex. Civ. App.—Dallas 1974, no writ); *Maxwell v. Bankston's Estate*, 433 S.W.2d 229, 232 (Tex. Civ. App.—Texarkana 1968, no writ).

[28] *E.g., Sterling Prop. Mgmt., Inc. v. Tex. Commerce Bank, Nat'l Ass'n*, 32 F.3d 964, 968 (5th Cir. 1994); *First USA Mgmt., Inc. v. Esmond*, 960 S.W.2d 625, 627 (Tex. 1997); *see also Reaves Brokerage Co. v. Sunbelt Fruit & Vegetable Co.*, 336 F.3d 410, 414 (5th Cir. 2003) ("Characterization of the agreement at issue turns on 'the substance of the relationship' between Fidelity and Sunbelt, 'not simply the label attached to the transaction.'"); *ECE Techs. Inc. v. Cherrington Corp.*, 168 F.3d 201, 204 (5th Cir. 1999) ("It is not surprising then that Texas usury law focuses on the substance of a transaction, not on its form."); *Najarro v. SASI Int'l, Ltd.*, 904 F.2d 1002, 1007 (5th Cir. 1990) (holding "the name that the parties give to that contract is irrelevant for purposes of determining

EWC has made a form-over-substance argument that the parties' characterization of a transaction as an account purchase transaction is dispositive.  To be sure, Section 306.103(b) of the Texas Finance Code does provide that "the parties' characterization of an account purchase transaction as a purchase is conclusive that the . . . transaction . . . is not a [loan]."[29]  But Section 306.103(b) applies only if (1) the transaction involved the sale of accounts, (2) the parties intended to enter a transaction for the sale of accounts, and (3) the parties characterized the transaction as such.[30]  According to *Korrody v. Miller*—the only case that has interpreted Section 306.103(b)—the presence or absence of those factors "must be determined by ascertaining the intention of the parties as disclosed by the contract, attending circumstances, or both."[31]  Because the attending factors in this case prove that the Agreements did not involve the sale of accounts and that neither SSI nor EWC intended to enter a transaction for the sale of accounts, Section 306.103(b) does not apply.

Because Section 306.103(b) does not apply, the Court should ignore the self-serving labels assigned to the Agreements by EWC and, instead, consider the substantive reality of the transactions.[32]  Considering the totality of the circumstances, it clear that the transactions between EWC and SSI were loans, not account purchases.

---

whether there was a loan for purposes of the usury laws"); *Tex. Tool Traders v. W. E. Grace Mfg. Co.*, 488 S.W.2d 498, 501 (Tex. Civ. App.—Dallas 1972, writ granted) (citing *Pickrell v. Alpha Pipe & Steel, Inc.*, 406 S.W.2d 956, 959 (Tex. Civ. App.—Amarillo 1966, writ ref'd n.r.e.) ("Under the law we must be guided by reality rather than by form, and even though the form of the contract be valid and free from the taint of usury of its face 'if from all the facts its essence is found to be the receiving or contracting for a greater rate of interest than is allowed by law, the statutory consequences must be visited upon it.'"); *see also Bray v. McNeely*, 682 S.W.2d 615, 617 (Tex. App.—Houston [1st Dist.] 1984, no writ).

[29] Tex. Fin. Code § 306.103(b).

[30] [Dkt. No. 56 at 5 (citing Tex. Fin. Code § 306.103(b); *Korrody v. Miller*, 126 S.W.3d 224, 226 (Tex. App.—San Antonio 2003, no pet.)].

[31] *Korrody*, 126 S.W.3d at 226.

[32] *See Sterling*, 32 F.3d at 968; *Esmond*, 960 S.W.2d at 627.  The Texas Legislature could not have intended to enact a law that conclusively allows a creditor, like EWC, to charge interest in excess of 150% simply by mislabeling its loans as "purchases."  The Texas Supreme Court has long recognized the inherent problem with allowing a label to dictate the interpretation of a transaction:

    **a.**    **The Agreements do not contemplate "account purchase transactions" as those transactions are defined by the Texas Finance Code.**

According to Section 306.001(1), an "account purchase transaction" is "an agreement under which a person engaged in a commercial enterprise sells accounts, instruments, documents, or chattel paper subject to this subtitle at a discount, regardless of whether the person has a repurchase obligation related to the transaction."[33]  Here, SSI sold no existing "accounts, instruments, documents, or chattel paper," as is done in a traditional factoring arrangement. Rather, SSI agreed to repay the advance plus the additional interest by making daily payments to EWC out of its *future* income stream—from accounts that did not exist at the time the parties executed the contract.[34]  Even Plaintiff has admitted that "the Agreements are 'not the classical form of factoring[.]'"[35]

    **b.**    **EWC did not operate or manage the transactions as if they were account purchase transactions.**

EWC acted as a lender (*not a factor*), and its method of "advancing" cash mirrored the procedures used by typical lenders.  In contrast to a lending relationship, under a factoring agreement (a/k/a an account purchase transaction), the factor purchases a client's *billing invoices* at a discount in exchange for an interest in the receivables *owed* by third parties – customers – in

---

In the ordinary affairs of life, money advanced upon such securities, with the understanding that both principal and interest may be collected by realizing upon the securities, is called a loan. A debt is created; otherwise the party advancing the money has no right to recover principal, together with interest on the amount advanced. Having the full effect of a loan, it must be treated as such, considered in reference to our usury laws; otherwise the few features of the transaction which give it a different appearance would furnish a device by which those laws might be evaded altogether.

*Jackson v. Cassidy*, 4 S.W. 541, 544 (Tex. 1887).
[33] Tex. Fin. Code § 306.001(1).
[34] EWC purchased "future" accounts—accounts neither in existence nor due and owing when the parties entered into the Agreements.  [App. 5, 11, 17, 23, 31, 39, 47, 55, 63, 71].  Moreover, it was EWC who drafted the Agreements and labeled them "Future Receivables Sale Agreements"—not SSI.  [App. 302, 84:1-5].  SSI treated the Agreements as loans in its own financial books and records.  [*Id.* at 323, 153:13-16].
[35] [Dkt. 56 at 6 (citing Pl.'s Reply 7, ECF No. 7)].

payment of these invoices.[36] "The factor pays a discounted amount for the invoices and *manages the receivables and collections.*"[37] "On payment, *the factor remits* a portion of the payment to the factoring client, retaining the remainder for service fees."[38]

Here, like a lender would do, EWC took a security interest in all of SSI's assets, including all of its tangible personal property, intangible property, and the like—not just in the "receivables" that might eventually be owed by third parties.[39] Moreover, the so-called "future credit card receivables" were not actually receivables at all. Rather, they were *future credit card payments* from SSI's *future customers* to SSI.[40] Nothing was "owed;" no "receivables" existed.[41] Indeed, at the time of the Agreements, there were no "billing invoices" whatsoever. Neither EWC nor SSI could have even so much as guessed at the identities of SSI's future customers from whose future credit card payments EWC was to be repaid.[42] Of course, EWC played no role in "managing" these future payments or in "remitting" a portion of the future payment to SSI.

The Agreements contrast sharply with the typical factoring relationship where the factor purchases a client's *existing* invoices, *manages* the receivables, and *remits* payment to the factoring client.[43] The Agreements themselves conclusively establish that EWC purchased no invoices from SSI, managed none of SSI's receivables, and remitted no portion of any such

---

[36] *ATC Healthcare Servs., Inc. v. New Century Fin., Inc.*, No. 01-10-00940-CV, 2011 WL 2739540, at *1 (Tex. App.—Houston [1st Dist.] July 14, 2011, no pet.).
[37] *Id.* (emphasis added).
[38] *Id.* (emphasis added).
[39] [App. 80-85].
[40] [*See id.* at 5, 11, 17, 23, 31, 39, 47, 55, 63, 71].
[41] Rather, the purported "accounts" purchased were "future" accounts and therefore, no amounts were owed and no bills or invoices had issued at the time of the Agreements' execution. [*See id.*].
[42] Again, EWC purchased "future" accounts—accounts neither in existence nor due and owing when the parties entered into the Agreements. [*See id.*].
[43] *See ATC Healthcare*, 2011 WL 2739540, at *1.

receivables to SSI. Therefore, the Agreements are *not* account purchase transactions—no matter what label EWC unilaterally gave them—they are loans as a matter of law.

### c. EWC took a security interest in all of SSI's assets—not just the "future receivables."

The Agreements show that EWC and SSI intended for EWC to act as a secured lender to SSI. In *Reaves*, the Fifth Circuit held that the so-called purchaser's filing of a UCC financing statement listing as collateral the merchant's "accounts, contract rights, instruments, documents, chattel paper" and other "general intangibles"—not just the accounts receivable purportedly sold—tilted the scales in favor of finding the agreement to be a loan (and not a true sale).[44]

Indeed, EWC took a security interest "in all of [SSI's] present and future accounts, chattel paper, cash, deposit accounts, personal property, assets and fixtures, all licenses and permits, general intangibles, intellectual property, instruments, equipment, and inventory wherever located, and all proceeds and revenue now or hereafter owned or acquired by [SSI] from any and all of the foregoing."[45] EWC then perfected the security interest by filing comprehensive UCC-1 Financing Statements covering the same lengthy list of collateral—not just the future credit card payments purportedly sold.[46] Just as in *Reaves*, EWC's comprehensive financing filing reveals the true essence of the arrangement between EWC and SSI—a loan.[47]

### d. EWC considered only SSI's creditworthiness and ignored the creditworthiness of SSI's customers.

A traditional factor would look to a third party's creditworthiness, rather than the seller of accounts receivable, to decide the likelihood of repayment. After all, the seller is not expected to pay on the accounts receivable; the customers are. But here, SSI <u>was</u> obligated to repay EWC.

---

[44] *See Reaves*, 336 F.3d at 414-16.
[45] [App. 6, 12, 18, 24, 32, 40, 48, 56, 64, 72 ¶ 4].
[46] [*Id.* at 80-85].
[47] *See Reaves*, 336 F.3d at 414-16.

In other words, SSI was not just a seller, as it would be in an account purchase transaction; SSI was a debtor, as it would be in a loan transaction.

EWC's creditworthiness analysis reflects this reality.  Before advancing any money to SSI, EWC ran a credit check on SSI and "pre-qualified" SSI by examining its recent credit card volume to determine how much it could lend to SSI to be paid back within a number of months (usually six  to ten) given SSI's volume of credit card transactions.[48]  EWC also engaged in formal "underwriting" (through its "Underwriting Department") and made risk assessments for repayment based on SSI's creditworthiness and revenues.[49]

### e.      SSI bore all of the risk of non-performance.

Unlike a factoring agreement where the creditor bears the risk of non-performance, SSI (the debtor) bore all of the risk by remaining liable to EWC in the event SSI breached the Agreements or faced an inability to pay.[50]  In *Endico Potatoes*, the Second Circuit analyzed who bore the risk of non-performance in deciding whether there was a sale of accounts receivable or a secured lending arrangement.  The Court correctly noted, "[w]here the lender has purchased the accounts receivable, the borrower's debt is extinguished and the lender's risk with regard to the performance of the accounts is direct, that is, the lender and not the borrower bears the risk of non-performance by the account debtor."  If the lender holds only a security interest, however, the lender's risk is derivative or secondary, that is, the borrower remains liable for the debt and bears the risk of non-payment by the account debtor, while the lender only bears the risk that the account debtor's non-payment will leave the borrower unable to satisfy the loan.[51]

---

[48][*See* App. 305-06, 113:3-115:4].
[49] [*Id.*].
[50] *See Endico Potatoes, Inc. v. CIT Grp./Factoring, Inc.*, 67 F.3d 1063, 1069 (2d Cir. 1995).  Although *Endico Potatoes* is a case involving PACA, the court's reasoning extends beyond that context.  *See id.*
[51] *Id.*

Here, EWC's risk is non-existent.  A percentage of each and every future credit card payment from SSI's customers will always be diverted to EWC until the Amount Sold is repaid pursuant to the Agreements' express terms, thereby ensuring repayment.[52]  In order to avoid being held hostage by this system of repayment, SSI had to change its credit card processor.[53] But the Agreements prohibited such an action without EWC's prior written consent[54]—consent that EWC would never grant an obligor without first establishing a similar remittance schedule with the new processor.  Of course, once SSI changed its processor, EWC filed its breach-of-contract claim, demanding "all amounts due and owing pursuant to the Agreement[s]"[55] (i.e., the now-accelerated "Amount Sold," which includes an added amount constituting interest exceeding the statutory maximum).[56]  In short, EWC assumed no risk in connection with the Agreements because SSI's obligation to repay was absolutely assured.

EWC further insulated itself from risk by requiring the execution of a personal guaranty in connection with the Agreements in order to solidify SSI's absolute obligation to repay the principal amounts loaned.[57]  Paragraph 28 in the Agreements provides that, upon any breach by SSI, the guarantor Margalith becomes "fully liable to [EWC] for the entire Amount Sold plus any liquidated damages and permitted fees and costs under this Agreement less the amount received by [EWC] from the Daily Percentage."[58]

In *Reaves*, a similar personal guaranty supported the Fifth Circuit's holding that the so-called factoring agreement was actually a loan, despite the presence of several terms and

---

[52] [App. 5-78].
[53] [*See id.* at 234-37].
[54] [*Id.* at 7, 13, 19, 25, 33, 41, 49, 57, 65, 73, ¶ 7].
[55] [Compl., ECF No. 2].
[56] [*See, e.g.,* App. 28, 36, 44, 52, 60, 68, 76, ¶ 18].
[57] [*See, e.g., id.* at ¶ 19].
[58] [*See, e.g., id.*].

provisions characteristic of a sale of accounts.[59]  In finding the absence of a true sale, the court held that when the parties' agreement was read in its entirety, and considering both the personal guaranty and the UCC filings covering substantially all of the merchant's assets (not just the accounts receivable purportedly sold), it became clear that "the *risk* of non-payment or underpayment [was] borne entirely by [the merchant] and [had] not shifted to [the purchaser]."[60]

As in *Reaves*, the Agreements always provide EWC with recourse against SSI.  And if EWC ever is without recourse against SSI, the risk shifts to Margalith, not EWC.[61]  Nothing stands in EWC's way when it comes to being repaid the entire "Amount Sold," which includes interest more than twice the statutory maximum.[62]

EWC previously has argued that its risk is SSI going out of business, in which case EWC claims it would not be paid so long as SSI gave EWC thirty days' notice before closing its doors.[63]  But the Agreements do not allow SSI to go out of business.  If SSI's business simply fails, it is a breach of the Agreements.[64]  Although EWC would have the Court believe that timely notice provided by SSI would prevent this result, nothing in the Agreements, and nothing in paragraph 19 upon which EWC has repeatedly attempted to rely, states that written notice excuses SSI's breach if SSI "close[s] its business, file[s] for bankruptcy, or consent[s] to an involuntary petition for bankruptcy being brought against it."[65]  Rather, paragraph 19 simply

---

[59] *See Reaves*, 336 F.3d at 414.  For example, in *Reaves*, (1) the agreement was titled a "factoring agreement" and stated that Fidelity became the absolute owner of Sunbelt's accounts; (2) Sunbelt's account debtors were required to be notified of the sale and instructed to pay Fidelity directly; (3) the parties agreed to a "purchase price;" and (4) Sunbelt had no right to vary the terms of any receivable purchased by Fidelity without Fidelity's prior written consent.  *Id.* at 414-15.  Nevertheless, Fidelity's obtaining two additional security rights—a personal guaranty from Sunbelt's president and a UCC financing statement listing Sunbelt's "accounts, contract rights, instruments, documents, chattel paper, and other "general intangibles" as collateral ("not just the accounts receivable purportedly sold")—evidenced a lending transaction, rather than a true sale.  *Id.* at 416.

[60] *Id.* at 415-16.

[61] [*See, e.g.,* App. 28, 36, 44, 52, 60, 68, 76, ¶ 19].

[62] *See infra* Part IV.D.

[63] [*See* Pl. Resp. to Em. Mtn. Diss., ECF No. 50].

[64] [*See* App. 7, 13, 19, 25, 33, 41, 49, 57, 65, 73, ¶ 7].

[65] [*Id.* at 7, 13, 19, 25, 28, 33, 36, 41, 44, 49, 52, 57, 60, 65, 68, 73, 76, ¶¶ 7, 18, 19].

requires SSI and Margalith to give EWC (1) 24-hour written notice before either SSI or Margalith files for bankruptcy and (2) 30-days written notice before SSI suspends, dissolves, or closes its business and/or completes a transaction involving the sale of SSI or a sale of substantially all of SSI's assets.[66]  The Agreements contain no language providing that notice would excuse what would otherwise be considered a breach.[67]

Because all practical indicia of a loan are present, there is no genuine issue of material fact that EWC loaned money to SSI.  This is true despite the self-serving labels EWC applied to the Agreements to avoid complying with usury requirements.  Because the totality of the circumstances demonstrates that there is no genuine issue of material fact regarding the nature of the transactions, SSI has conclusively established the first prerequisite of its usury defense and counterclaim.

### 2.    SSI Had an Absolute Obligation to Repay the Principal to EWC.

It is undisputed that SSI (and Margalith, as a personal guarantor of the loans) had an absolute obligation to repay EWC.  Indeed, EWC's corporate representative conceded during his deposition that "under Paragraph 18, . . . SSI is obligated to repay the outstanding amounts sold [and i]f SSI couldn't pay that amount or wouldn't or didn't, then Ethan Margalith would be looked to as the guarantor."[68]

---

[66] [*See, e.g., id.* at 28, 36, 44, 52, 60, 68, 76, ¶ 19].

[67] There are many reasons why EWC included the "Required Notice" provision in its form agreements, such as, among other possibilities, to exercise its self-help rights, including accelerating repayment of the entire Amount Sold, taking over the operation and control of SSI's business until the outstanding Amount Sold is remitted, and/or instructing the credit card processor to forward the outstanding Amount Sold to EWC.  [*See, e.g., id.* at ¶ 18].  The *least* likely reason for including this provision would be to give SSI—a company that EWC knew was a "high risk" borrower based on an Intelliscore Plus rating of a "1" and "2" on a scale of 1 to 100—a loophole to avoid repayment.  [*Id.* at 242-97 ("When compared to all business, [0% to 1%] of business indicate a higher likelihood of severe delinquency than this business")].  Even if there is any ambiguity (there is not), the language of the contract must be construed against EWC as the drafter of the form agreements.  *See In re Deepwater Horizon*, 728 F.3d 491, 499 (5th Cir. 2013) (noting "the doctrine of *contra proferentem* . . . construes any ambiguities against the drafter"); *Republic Nat'l Bank of Dallas v. Nw. Nat'l Bank of Fort Worth*, 578 S.W.2d 109, 115 (Tex. 1978) ("In Texas[,] a writing is generally construed most strictly against its author.").

[68] [App. 311, 187:2-14].

---

Even if EWC had not conceded this point, it is conclusively established by the evidence. To ensure repayment and as part of the loan process, EWC required SSI to switch credit card processors, and a percentage of each credit card payment from SSI's customers was electronically diverted to EWC.[69]  EWC then completely insulated itself from any risk of loss by filing financial statements listing substantially all of SSI's assets, requiring an automatic diversion of SSI's future credit card payments, and obtaining a personal guaranty from Ethan Margalith.[70]  Upon default or breach by SSI, EWC enjoyed a host of remedies typically associated with lenders, not factoring companies:

- the entire outstanding Amount Sold shall become immediately due and payable, i.e., a standard acceleration clause characteristic of a loan;

- EWC could automatically debit from any of SSI's bank accounts all or any portion of the outstanding Amount Sold;

- EWC could instruct its credit-card processor to forward to EWC, without prior notice to SSI, all or any portion of the outstanding Amount Sold; and

- EWC enjoyed the right, without notice to SSI, to enter upon the premises of any or all of SSI's business locations and take over the operation of SSI's business and direct all of the proceeds from the operations of SSI's business until the outstanding Amount Sold is paid to EWC.

Because EWC (1) expected to receive the same Amount Sold (which includes added money that amounts to interest exceeding twice the statutory maximum) regardless of whether SSI's business prospered or failed and (2) could lose no part of the money loaned unless both SSI and Margalith were unable to pay and the secured collateral proved insufficient, SSI had an absolute obligation to repay the principal. If there was no absolute obligation to repay, why is EWC suing SSI and Margalith for the entire Amount Sold under the Agreements?  EWC cannot

---

[69] [*Id.* at 2, ¶ 5, 11, 17, 23, 31, 39, 47, 55, 63, 71].
[70] [*Id.* at 5-78].

simultaneously bring suit on agreements establishing an absolute obligation to repay while simultaneously denying that such an obligation exists.

### 3.   EWC Contracted For Interest Exceeding the Legal Limit.

As to the third element of usury, the evidence before the Court conclusively establishes that EWC contracted for interest in excess of the legal limit. In fact, the interest contracted for was more than twice the Texas usury ceiling. "Interest" is defined as "compensation for the use, forbearance, or detention of money."[71] "Texas law has long been hostile to charges of interest the state thought were excessive. This policy cuts little slack for artful avoidance."[72] The Texas Finance Code therefore prohibits creditors from contracting for, charging, or receiving "interest" in excess of the statutory limit on a loan.[73]

It is well-settled that any charge made for the use, forbearance, or detention of money is "interest" for usury purposes no matter the label placed upon it or the artfulness with which it is concealed.[74] The absence of an express rate of interest in an agreement is not dispositive.[75] Here, EWC tried to conceal its contracting for interest in excess of the usury ceiling by grouping the additional charge owed by SSI in with the total "Amount Sold."

In his report, Bruce L. Ross, SSI's expert on interest, explained that the term "Purchase Price," as used in the Agreements, constitutes the advance of principal made by EWC to SSI and that the term "Amount Sold" is the total amount of principal *and imputed interest* to be repaid by

---

[71] Tex. Fin. Code § 301.002(a)(4).
[72] *ECE Techs.*, 168 F.3d at 204.
[73] Tex. Fin. Code § 305.001.
[74] *See Najarro*, 904 F.2d at 1008; *Gonzales Cnty. Sav. & Loan Ass'n v. Freeman*, 534 S.W.2d 903, 906 (Tex. 1976) ("Charges which are in fact interest remain so, regardless of the label used."); *Skeen v. Slavik*, 555 S.W.2d 516, 521 (Tex. Civ. App.—Dallas 1977, writ ref'd n.r.e.) ("[W]e must look beyond the superficial appearances of the transactions to their substance in determining the existence or nonexistence of usury."); *Maxwell*, 433 S.W.2d at 231 ("In determining the question of usury all devices are disregarded . . . [even] though usury may be covered under the guise of some additional and different consideration.").
[75] *See Sturm v. Muens*, 224 S.W.3d 758, 764 (Tex. App.—Houston [14th Dist.] 2007, no pet.).

SSI to EWC.[76]  Ross ultimately determined that the imputed annual interest rate was as follows for the ten agreements: 172% for the May 2, 2011 Agreement; 60% for the September 26, 2011 Agreement; 117% for the May 22, 2012 Agreement; 69% for the August 13, 2012 Agreement; 51% for the September 14, 2012 Agreement: 69% for the December 28, 2012 Agreement; 83% for the January 20, 2013 Agreement; 194% for the April 17, 2013 Agreement; 552% for the May 29, 2013 Agreement;  and 205,870% for the July 11, 2013 Agreement.[77]

These exorbitant interest rates clearly exceed the statutory maximum of 10% set forth in section 302.001 of the Texas Finance Code.[78]  In fact, Ross concluded:

> [I]t is my opinion that the APR or imputed interest rate for each and every Agreement, and for all of the Agreements taken as a whole, exceeded the 10% legal interest rate provided for in the Texas Finance Code. . . . [I]n each case, the imputed interest rate was more than twice the legal rate.[79]  (emphasis added).

EWC expressly contracted for a contingency that would allow it to receive more than the lawful rate of interest by including the "Remedies; Self-Help" provision, which permits EWC to accelerate the entire outstanding Amount Sold in the event of a breach or default by SSI.[80]  Accordingly, there is no genuine issue of material fact as to whether EWC contracted for the receipt of more than the lawful rate of interest in violation of the Texas Finance Code—it most certainly did.

## C.    SSI Is Entitled To Damages in Connection With the Usurious Interest.

Under the Texas Finance Code, a creditor is liable for damages when it contracts for, charges, or receives interest that is greater than the amount authorized by law in connection with

---

[76] [App. 90].
[77] [Id. at 92, 131].
[78] See Tex. Fin. Code § 302.001(b) ("The maximum rate or amount of interest is 10 percent a year except as otherwise provided by law.  A greater rate of interest than 10 percent a year is usurious unless otherwise provided by law.").
[79] [App. 94].
[80] [See, e.g., id. at 28, 36, 44, 52, 60, 68, 76, ¶ 18].

a commercial transaction.[81]   Additional damages may be awarded upon proof that the creditor received interest that was *more than double* the amount authorized by law.[82]   Because the evidence conclusively establishes that EWC contracted for, charged, and received usurious interest from SSI, the Court should award the maximum amount of damages authorized under sections 305.001, 305.003, and 305.004 of the Texas Finance Code.

**D.      Having Established its Usury Defense as a Matter of Law, SSI Is Not Liable to EWC for Breach of Contract.**

SSI has met its burden of showing there is no genuine issue of material fact (1) that EWC loaned money to SSI, (2) that SSI (and Margalith as a personal guarantor of the loans) had an absolute obligation to repay the principal, and (3) that EWC contracted for, charged, or received interest that exceeded the maximum amount allowed by law.   Accordingly, SSI has established its usury defense as a matter of law,[83] thus preventing EWC from recovering for breach of the usurious loan Agreements. SSI, therefore, respectfully requests that the Court dismiss EWC's breach of contract claim and its request for the alleged damages associated therewith.

**E.      If SSI is Not Liable Under the Agreements, SSI and Margalith are Not Liable Under Any Legal Theory Advanced by EWC.**

To prevail on its promissory estoppel, fraud, or fraudulent inducement claims, EWC would have to establish that it suffered damages as a result of SSI's allegedly wrongful conduct because damages are an essential element of each cause of action.[84]   But EWC can make no such showing if the Court finds that SSI is not liable under the Agreements.   As EWC's Complaint and the testimony of EWC's corporate representative make clear, the only claimed damages are

---

[81] Tex. Fin. Code §§ 305.001(a-1), 305.003(a)(1).
[82] Tex. Fin. Code § 305.004(a).
[83] *See Trammell Crow Residential Co. v. Virginia Sur. Co.*, 643 F. Supp. 2d 844, 850 (N.D. Tex. 2008).
[84] *Nagle v. Nagle*, 633 S.W.2d 796, 800 (Tex. 1982); *Henning v. OneWest Bank FSB*, 405 S.W.3d 950, 963 (Tex. App.—Dallas 2013, no pet.); *Fletcher v. Edwards*, 26 S.W.3d 66, 77 (Tex. App.—Waco 2000, pet. denied).

contractual in nature and relate to SSI's alleged obligation to repay EWC the Amount Sold.[85] Thus, because SSI is not liable to EWC for breach of contract, EWC's claims for promissory estoppel, fraud, and fraudulent inducement should also be dismissed.

Moreover, the Texas Supreme Court has held that a party cannot maintain a claim for fraud or fraudulent inducement when that claim is premised on an unenforceable contract because (1) there is no detrimental reliance and (2) awarding expectancy or lost profit damages effectively would render the contract enforceable.[86] Because the Agreements are unenforceable, Plaintiff's claims for fraudulent inducement, fraud, and promissory estoppel also fail.

Finally, Margalith cannot be liable to EWC as a guarantor of the unenforceable Agreements. "[T]he guarantor's liability on a debt is measured by the principal's liability."[87] "Therefore, unless the debtor is bound under the principal contract, there is no obligation which is guaranteed and the guarantor is not liable to the creditor if the debtor fails to perform."[88]

Because neither SSI nor Margalith is liable to EWC under any theory of liability, this Court should grant summary judgment on all claims asserted by EWC.

# VI.
## CONCLUSION AND REQUEST FOR RELIEF

For these reasons, SSI respectfully requests that this Court grant summary judgment on its counterclaim and affirmative defense of usury, award in damages to SSI in an amount to be determined by the Court, dismiss EWC's claims for breach of contract and associated damages, dismiss EWC's claims for promissory estoppel, fraud, and fraudulent inducement, award

---

[85] [App.308-09].
[86] *Haase v. Glazner*, 62 S.W.3d 795, 797-800 (Tex. 2001); *see also English v. Fischer*, 660 S.W.2d 521, 524 (Tex. 1983) (substantial detrimental reliance is an essential element of promissory estoppel).
[87] *84 Lumber Co., L.P. v. Powers*, 393 S.W.3d 299, 308 (Tex. App.—Houston [14th Dist.] 2012, pet. denied).
[88] *Univ. Metals & Machinery, Inc. v. Bohart*, 539 S.W.2d 874, 881 (Tex. 1976).

reasonable and necessary attorneys' fees to SSI, together with costs of court and post-judgment interest, and grant all other relief to which SSI is entitled.

Respectfully submitted,

_/s/ Toby M. Galloway_
Toby M. Galloway
Texas State Bar No. 00790733
Colleen M. Deal
Texas State Bar No. 24082909
KELLY HART & HALLMAN LLP
201 Main Street, Suite 2500
Ft. Worth, Texas  76102
(817) 332-2500 (phone)
(817) 878-9727 (fax)
toby.galloway@kellyhart.com (email)

**ATTORNEYS FOR DEFENDANTS**

## <u>CERTIFICATE OF SERVICE</u>

      I hereby certify that on February 24, 2014, I electronically filed the foregoing document with the Clerk of Court for the U.S. District Court, Northern District of Texas, using the CM/ECF system of the Court which will send a "Notice of Electronic Filing" to the following attorneys of record who have consented in writing to accept this Notice as service of this document by electronic means:

rcuccia@cuccialegal.com
Richard A. Cuccia, II
CUCCIA LEGAL COUNSEL, PLLC
545 E. John Carpenter Freeway, Ste. 670
Irving, Texas 75062

wmcdowell@theexpressteam.com
Wesley C. McDowell
MCDOWELL LAW
545 E. John Carpenter Freeway, Ste. 670
Irving, Texas 75062

                      */s/ Toby M. Galloway*
                  Toby M. Galloway