**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

|  |  |  |
|---|---|---|
| EXPRESS WORKING CAPITAL, LLC, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 3:13-cv-3045-O |
| | § | |
| STARVING STUDENTS, INC. et al., | § | |
| | § | |
| Defendants. | § | |
| | § | |

## MEMORANDUM OPINION AND ORDER

Before the Court are Defendants' Motion for Partial Summary Judgment and Brief and Appendix in Support (ECF Nos. 86-88), filed February 24, 2014; Plaintiff's Response and Appendix in Support (ECF Nos. 119-20), filed March 17, 2014; and Defendants' Reply (ECF No. 125), filed March 28, 2014.[1]  Having considered the record and the applicable law, the Court finds that Defendants' Motion for Partial Summary Judgment (ECF No. 86) should be and is hereby **DENIED**.

Also before the Court are Plaintiff's Amended Motion for Partial Summary Judgment and Brief and Appendix in Support (ECF Nos. 99-101), filed March 5, 2014; Defendants' Response and Appendix in Support (ECF Nos. 116-17), filed March 17, 2014; and Plaintiff's Reply (ECF No. 128), filed March 31, 2014.  Having considered the record and the applicable law, the Court finds

---

[1] Defendants also filed a Motion to Strike Portions of Summary Judgment Evidence (ECF No. 132). Defendants request that the Court strike paragraphs 9 and 10 of the Declaration of Joe Womack and paragraph 11 of the Declaration of Dana Fricke "because they contain several unsubstantiated conclusions and cannot serve as summary judgment evidence as a matter of law." *See* Defs.' Mot. Strike 3, ECF No. 132. The Court reviewed Defendants' motion and the evidence and determines that the evidence is not central to the Court's conclusions, and sustaining Defendants' objections would not change the result.  Therefore, Defendants' Motion to Strike (ECF No. 132) is **DENIED as moot**.

that Plaintiff's Amended Motion for Partial Summary Judgment (ECF No. 99) should be and is hereby **GRANTED in part** and **DENIED in part**.

## I.    BACKGROUND

This case arises out of a series of financing agreements and their proper characterization. Plaintiff Express Working Capital, LLC ("Plaintiff") and Defendants Starving Students, Inc. and Ethan Margalith (collectively "Defendants") entered into a series of "Future Receivables Sale Agreement[s]" ("Agreements") on December 28, 2012; January 30, 2013; April 17, 2013; May 29, 2013; and July 11, 2013.[2]  *See* Pl.'s App. Supp. Mot. Summ. J. Exs. A-E (Agreements), App. 4-48, ECF No. 101.  Under the Agreements, Defendants sold a percentage of their future credit card receivables to Plaintiff for a fixed fee.  The dollar value of the receivables being sold was the "Amount Sold," and the dollar amount Plaintiff paid Defendants for the receivables was the "Purchase Price."  *See, e.g.*, *id.* Ex. A (Dec. 28, 2012 Agreement), App. at 5.  Under the five Agreements at issue, Plaintiff purchased $1,775,500.00 worth of credit card receivables from Defendants for $1,325,000.00.  *Id.* Ex. F (Fricke Decl.), App. at 50-51.  Defendant Ethan Margalith ("Margalith"), the owner of Defendant Starving Students, Inc. ("SSI"), signed each Agreement on behalf of SSI and himself.  *See, e.g.*, *id.* Ex. A (Dec. 28, 2012 Agreement), App. at 12; *see also id.* Ex. H (Margalith Dep.), App. at 66.

The Agreements provided that Defendants' credit card processor, Fortis Payment Systems ("Fortis"), would automatically transmit a certain percentage of Defendants' future credit card

---

[2]  The parties entered into a total of ten Agreements during the business relationship.  Five of the Agreements were paid in full, and the only Agreements at issue are the Agreements entered into on December 28, 2012; January 30, 2013; April 17, 2013; May 29, 2013; and July 11, 2013.  *See* Pl.'s Br. Supp. Mot. Summ. J. 8, ECF No. 100; *see also* Pl.'s Am. Compl. ¶ 9, ECF No. 82.

receivables to Plaintiff, until Plaintiff received the full amount due under the Agreements.  *See, e.g.*, *id.* Ex. A (Dec. 28, 2012 Agreement), App. at 5.  Defendants would remit to Plaintiff the daily percentage of each of Defendants' "future accounts and contract rights arising from and relating to the payment of monies from the use of [Defendants'] customers of . . . credit cards, charge cards, debit cards and/or prepaid cards ('Future Receivables') to purchase [Defendants'] products and/or services . . . ."  *See, e.g.*, *id.* at 5-6.

Defendants agreed that they would not: (1) change their credit card processor without Plaintiff's prior consent, (2) close or sell their business without notifying Plaintiff, or (3) sell the future receivables to other parties.  *See, e.g.*, at 7, 10 (setting out Defendants' "Representations and Covenants; Events of Default" in paragraph 7 and "Required Notifications" in paragraph 19).  Defendants also agreed not to take "any action or offer any incentive . . . to discourage the use of credit cards, debit cards or other payment cards for the purchase of Merchant's products and/or services," or permit "any event to occur that may have an adverse effect on the use, acceptance, or authorization of credit cards, debit cards, or other payment cards for the purchase of Merchant's products and/or services."  *See, e.g.*, *id.* at 7.  Defendants represented that they were not delinquent with any taxing authority and that all the information provided in the Agreements was "true and correct and accurately reflect[ed] [Defendants'] financial condition . . . ."  *See, e.g.*, *id.*

Plaintiff asserts that it paid the purchase price for each Agreement, with the last payment being made on or about July 11, 2013.  *See id.* Ex. F (Fricke Decl.), App. at 51.  On or about July 24, 2013, Defendants ceased the remittance of the purchased receivables to Plaintiff.  *See id.*; Defs.' App. Supp. Mot. Summ. J. Ex. A (Margalith Decl.), App. at 6, ECF No. 88.  Defendants made the decision to cease the remittance of payments to Plaintiff sometime after Defendants received the last

3

cash advance from Plaintiff.  *See* Pl.'s App. Supp. Mot. Summ. J. Ex. G (Carlsson Dep.), App. at 59; *id.* Ex. H (Margalith Dep.), App. at 69-71.  Defendants assert that they decided to cease the payments to Plaintiff after they were "advised" in July 2013 by their attorney that the Agreements were illegal.  *See* Defs.' App. Supp. Mot. Summ. J. Ex. A (Margalith Decl.), App. at 6.

Plaintiff moved for summary judgment on its breach of contract, promissory estoppel, fraud, and fraudulent inducement claims.  Plaintiff contends the Agreements were account purchase transactions and not usurious loans and argues Defendants breached the Agreements by switching their credit card processor and ceasing the remittance of payments.  *See* Pl.'s Br. Supp. Mot. Summ. J. 9, ECF No. 100; Pl.'s Resp. Defs.' Mot. 2, ECF No. 119.  Defendants argue that the Agreements were usurious loans and are therefore unenforceable.  *See* Defs.' Br. Supp. Mot. Summ. J. 7, ECF No. 87.  Defendants moved for summary judgment on their usury defense and usury counterclaim. Defendants also argue that their usury defense and counterclaim entitles Defendants to judgment as a matter of law as to all of Plaintiff's claims.  *See* Defs.' Mot. Summ. J. 1, ECF No. 86.  After the parties completed their briefing on the motions, the Court held a hearing on the motions.  *See* Order, May 5, 2014, ECF No. 139; Order, May 15, 2014, ECF No. 142.  These issues are therefore ripe for determination.

## II.    LEGAL STANDARD

Summary judgment is proper when the pleadings and evidence on file show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "[T]he substantive law will identify which facts are material." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*  The

movant makes a showing that there is no genuine issue of material fact by informing the court of the basis of its motion and by identifying the portions of the record which reveal there are no genuine material fact issues. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); Fed. R. Civ. P. 56(c).

When parties file cross-motions for summary judgment, courts consider each motion separately "because each movant bears the burden of showing that no genuine issue of material fact exists and that it is entitled to a judgment as a matter of law." *Am. Int'l Speciality Lines Ins. Co. v. Rentech Steel LLC*, 620 F.3d 558, 562 (5th Cir. 2010) (citing *Shaw Constructors v. ICF Kaiser Eng'rs, Inc.*, 395 F.3d 533, 538-39 (5th Cir. 2004)); *see also Fire King Int'l LLC v. Tidel Eng'g, L.P.*, 613 F. Supp. 2d 836, 838 (N.D. Tex. 2009) (Fish, J.) ("Where a case is presented by way of cross-motions for summary judgment, each movant has the burden of producing evidence to support its motion."). When reviewing the evidence, courts must decide all reasonable doubts and inferences in the light most favorable to the non-movant. *See Walker v. Sears, Roebuck & Co.*, 853 F.2d 355, 358 (5th Cir. 1988). Courts cannot make a credibility determination in light of conflicting evidence or competing inferences. *Anderson*, 477 U.S. at 255. As long as there appears to be some support for the disputed allegations such that "reasonable minds could differ as to the import of the evidence," the motion for summary judgment must be denied. *Id.* at 250.

## III.   ANALYSIS

The parties dispute whether the Agreements constitute loans or account purchase transactions. Because this dispute is dispositive to Plaintiff's breach of contract claim and Defendants' usury defense and counterclaim, the Court will begin by addressing this issue.[3]

---

[3] Defendants do not address the elements of Plaintiff's breach of contract claim. Rather, Defendants only dispute whether the Agreements were loans or account purchase transactions. *See, e.g.*, Defs.' Resp. 2, ECF No. 116 ("Plaintiff's motion should be denied because the facts demonstrate that the financing

A.      **Breach of Contract**

To establish a breach of contract claim, a plaintiff must show: "'(1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages sustained by the plaintiff as a result of the breach.'" *Tyler v. Citi-Residential Lending, Inc.*, 812 F. Supp. 2d 784, 787 (N.D. Tex. 2011) (Boyle, J.) (quoting *Smith Int'l, Inc. v. Egle Grp., LLC*, 490 F.3d 380, 387 (5th Cir. 2007)).  Defendants acknowledge that they breached the terms of the Agreements, but argue that the Agreements were usurious loans.  *See* Defs.' Br. Supp. Mot. Summ. J. 11-12, ECF No. 87.  The only element of Plaintiff's breach of contract claim at issue appears to be whether the Agreements were a valid contract.

In Texas, contracting for, charging, or receiving interest that is greater than the statutory maximum is contrary to public policy, and creditors that charge usurious interest are subject to penalties.  *See* Tex. Fin. Code §§ 302.001(c), 305.001.  In general, a transaction is usurious if it is a loan of money that requires a greater interest than allowed by law.  *See Bernie's Custom Coach of Tex. v. Small Bus. Admin.*, 987 F.2d 1195, 1197 (5th Cir. 1993) (quoting *Myles v. Resolution Trust Corp.*, 787 S.W.2d 616, 617 (Tex. App.—San Antonio 1990, no pet. h.)).  The essential elements of a usurious transaction are "(1) a loan of money; (2) an absolute obligation to repay the principal; and (3) the exaction of a greater compensation than allowed by law for the use of money by the borrower."  *First Bank v. Tony's Tortilla Factory, Inc.*, 877 S.W.2d 285, 287 (Tex. 1994) (citing *Holley v. Watts*, 629 S.W.2d 694, 696 (Tex. 1982)).

"The Texas usury statutes are penal in nature and are to be strictly construed."  *Pearcy Marine, Inc. v. Acadian Offshore Servs., Inc.*, 832 F. Supp. 192, 196 (S.D. Tex. 1993) (citing *Tex.*

arrangements at issue are usurious loans that render the contracts illegal and invalid.").

*Commerce Bank-Arlington v. Goldring*, 665 S.W.2d 103, 104 (Tex. 1984)).  Texas courts presume

that the parties intended a nonusurious contract.  *See Bernie's Custom Coach*, 987 F.2d at 1197

(quoting *Smart v. Tower Land & Inv. Co.*, 597 S.W.2d 333, 341 (Tex. 1980)); *see also Lovick v.*

*Ritemoney Ltd.*, 378 F.3d 433, 443 (5th Cir. 2004) ("[U]nder Texas law, there is a specific

presumption against a finding of usurious interest . . . Penal statutes, such as those for usury, are

strictly construed.") (citations omitted) (internal quotation marks omitted).  "Any doubt as to the

legislative intent to punish the activity complained of is to be resolved in favor of the defendant."

*Matter of Worldwide Trucks, Inc.*, 948 F.2d 976, 979 (5th Cir. 1991) (citing *Tygrett v. Univ. Gardens*

*Homeowners' Ass'n*, 687 S.W.2d 481, 485 (Tex. App.—Dallas 1985, writ ref'd n.r.e.)).

    "[I]t is fundamental that usury can arise only from a loan or forbearance of money."  *See*

*Pearcy Marine*, 832 F. Supp. at 196 (citing *Crow v. Home Sav. Ass'n of Dall. Cnty.*, 522 S.W.2d 457

(Tex. 1975)).  The Texas Finance Code provides that if parties intend to enter a transaction to sell

accounts at a discount and characterize the transaction as such, "it cannot be a loan or line of credit"

and any discount charged under such a transaction is not interest.  *See Korrody v. Miller*, 126 S.W.3d

224, 226 (Tex. App.—San Antonio 2003, no pet. h.) (citing Tex. Fin. Code § 306.103(b)); Tex. Fin.

Code § 306.103(a); *see also* Tex. Fin. Code § 306.001(1).  Accordingly, the Court must determine

whether the Agreements were loans or account purchase transactions; if the Agreements were

account purchase transactions, Defendants' usury defense and counterclaim must fail and Plaintiff

will prevail on its breach of contract claim.  *See Anglo-Dutch Petroleum Int'l, Inc. v. Haskell*, 193

S.W.3d 87, 96 (Tex. App.—Houston [1st Dist.] 2006, pet. denied) ("If there is no 'loan,' then any

disputed amount charged cannot be characterized as interest, and without interest, there cannot be

usury.") (citing *USA Mgmt., Inc. v. Esmond*, 960 S.W.2d 625, 628 (Tex. 1997)); *Korrody*, 126

S.W.3d at 228 ("At a minimum, a claim based on usury requires the finding that the transaction was a loan.") (citations omitted).

The Texas Finance Code defines a "loan" as "an advance of money that is made to or on behalf of an obligor, the principal amount of which the obligor has an obligation to pay the creditor." *See* Tex. Fin. Code § 301.002(a)(10). An "account purchase transaction" is "an agreement under which a person engaged in a commercial enterprise sells accounts, instruments, documents, or chattel paper . . . at a discount . . . ." *See id.* § 306.001(1). Although the Texas Finance Code defines both terms, "the distinction between purchase and lending transactions can be blurred." *See Reaves Brokerage Co. v. Sunbelt Fruit & Vegetable Co.*, 336 F.3d 410, 416 (5th Cir. 2003) (citation omitted) (internal quotation marks omitted);[4] *see also* Tex. Bus. & Comm. Code § 9.109 cmt. 4 (noting in many commercial financing transactions, the distinction between "transactions in which a receivable secures an obligation and those in which the receivable has been sold outright . . . is blurred").

To determine whether a transaction is a loan or a sale, courts ascertain the intention of the parties as disclosed by the contract, attending circumstances, or both. *See Korrody*, 126 S.W.3d at 226 (citing *Johnson v. Cherry*, 726 S.W.2d 4, 6 (Tex. 1987));[5] *see also Carter v. Four Seasons*

---

[4] Defendants rely heavily upon the Fifth Circuit's opinion in *Reaves*. The Court notes, however, that the agreement at issue in *Reaves* was entered into before the enactment of Section 306.103 of the Texas Finance Code, and the Fifth Circuit "expressly limit[ed]" its holding "to the facts and arguments presented in this admittedly close case." *See Reaves*, 336 F.3d at 412, 416.

[5] In *Johnson v. Cherry*, 726 S.W.2d 4, 6 (Tex. 1987), the Texas Supreme Court addressed the question of "whether an instrument written as a deed is actually a deed or is in fact a mortgage . . . ." To determine the true nature of a deed, Texas courts "ascertain[] the intent of the parties as disclosed by the contract or attending circumstances or both." *Id.*; *see also In re Jay*, 432 F.3d 323, 331-32 & n.26 (5th Cir. 2005) (Higginbotham, J., dissenting) ("Whether a sale was 'pretended' is determined primarily by the intent of the parties."). Courts use a similar analysis to construe ambiguous contracts. *See Barnes v. Forest Hills Inv., Inc.*, 11 F. Supp. 2d 699, 706 (E.D. Tex. 1998) ("The history of negotiations between the parties, as well as the events which occurred during the performance of the contract, are relevant in ascertaining the parties' true intent." (citing *United States v. Aluminum Co. of Am.*, 824 F. Supp. 640, 651-52 (E.D. Tex. 1993)).

*Funding Corp.*, 97 S.W.3d 387, 396 (Ark. 2003) ("[W]hether a factoring contract is, in fact, a disguised loan . . . turns principally on the intent of the parties as well as other attending factors."); *Bray v. McNeely*, 682 S.W.2d 615, 617 (Tex. App.—Houston [1st Dist] 1984, no writ) ("To determine whether this transaction should be classified as a loan or a sale, we must look to the intention of the parties as revealed by the contract and the surrounding circumstances." (citing *Rinyu v. Teal*, 593 S.W.2d 759, 761 (Tex. App.—Houston [14th Dist.] 1979, writ ref'd n.r.e.)). "So important is the parties' intent that section 306.103 of the Texas Finance Code provides, 'the parties' characterization of an account purchase transaction as a purchase is conclusive that the account purchase transaction is not for the use, forbearance, or detention of money.'" *Korrody*, 126 S.W.3d at 226 (quoting Tex. Fin. Code § 306.103(b))). "In other words, if the parties intend to enter an account purchase transaction (such as a factoring agreement) and characterize the transaction as such, it cannot be a loan or line of credit." *Id.*

Before addressing whether the Agreements were loans or account purchase transactions, the Court must first discuss the nature of the "Future Receivables." An "account purchase transaction" involves the sale of accounts at a discount. Tex. Fin. Code § 306.001(1); *see also In re Advance Payroll Funding, Ltd.*, 254 S.W.3d 710, 712 n.1 (Tex. App.—Dallas 2008, no pet.) ("Factoring involves the purchase of accounts receivable from companies at a discounted rate."). Defendants argue that Section 306.103(b) is not dispositive because Defendants merely agreed "to repay the advance plus the additional interest," and Plaintiff did not sell any accounts. Defs.' Br. Supp. Mot. Summ. J. 15, ECF No. 87.

The Court finds that the future credit card receivables in the Agreements are properly characterized as "accounts." The parties defined "Future Receivables" as Defendants' "future

accounts and contract rights arising from and relating to the payment of monies from the use by

[Defendants'] customers of . . . credit cards, charge cards, debit cards, and/or prepaid cards . . . ."

*See, e.g.*, Pl.'s App. Supp. Mot. Summ. J. Ex. A (Dec. 28, 2012 Agreement), App. at 5-6, ECF No.

101.   Defendants argue that Section 306.103(b) cannot apply because the accounts were not in

existence at the time of the Agreements.  *See* Defs.' Br. Supp. Mot. Summ. J. 15, ECF No. 87; Defs.'

Reply 3-4, ECF No. 125.   The Finance Code does not state that the "accounts, instruments,

documents, or chattel paper" must be in existence when the parties enter into their financial

arrangement and Defendants have not provided any support for their argument that Section

306.103(b) does not apply to accounts that were not in existence at the time of the arrangement.  *Cf.*

*Fast Cap. Mktg., LLC v. Fast Cap. LLC*, No. H-08-2142, 2008 WL 5381309, at *2 (S.D. Tex. Dec.

24, 2008) (noting defendant was in business of "purchasing future credit-card receipts at a discount

from merchants in exchange for cash.").

        The Code does not define "account" or "accounts receivable," but the Texas Business and

Commerce Code defines an "account" as "a right to payment of a monetary obligation, whether or

not earned by performance."  Tex. Bus. & Com. Code Ann. § 9.102(a)(2).  Black's Law Dictionary

defines an "account" as "[a] detailed statement of the debits and credits between parties to a

contract," and an "account receivable" as "a balance owed by a debtor" or "a debt owed by a

customer to an enterprise for goods or services."  Black's Law Dictionary (9th ed. 2009); *see also*

*In re Blast Energy Servs., Inc.*, 396 B.R. 676, 705 (Bankr. S.D. Tex. 2008) ("[A]n account receivable

denotes a right to payment.").   When Defendants' customers purchase Defendants' goods and

services with credit cards, charge cards, debit cards, or prepaid cards, "future accounts and contract

rights" are created, and Defendants have a right to receive payment from their customers.  Under the

10

Agreements, Defendants sold a portion of their right to receive payment on these accounts to Plaintiff. *See, e.g.*, Pl.'s App. Supp. Mot. Summ. J. Ex. A (Dec. 28, 2012 Agreement), App. at 5-6, ECF No. 101; *see also New Century Fin., Inc. v. Olympic Credit Fund, Inc.*, 487 F. App'x 912, 913 (5th Cir. 2012) ("Factoring is a type of financing where one business . . . sells its right to receive payment for goods sold or services rendered . . . to another business at a discounted price."). For these reasons, the Court finds that the "Future Receivables" are accounts for purposes of Section 306.103(b).

The Court now turns to the parties' characterization of the Agreements. The Agreements, which are labeled "Future Receivables Sale Agreement," state: "In consideration of the payment of the Purchase Price . . . [Plaintiff] purchases from [Defendants], and [Defendants] sell[] to [Plaintiff], the Amount Sold . . . ." *See, e.g.*, Pl.'s App. Supp. Mot. Summ. J. Ex. A (Dec. 28, 2012 Agreement), App. at 5. The Agreements further state: "[Defendants] and [Plaintiff] agree that the Purchase Price paid to [Defendants] is a purchase of the Future Receivables and is not intended to be, nor shall it be construed as, a loan . . . ." *See, e.g.*, *id.* at 6. The Agreements also contain a section titled "Non-Loan Advance," which states: "Because this is not a loan, [Plaintiff] does not charge any interest . . . or similar fees . . . . [Plaintiff] is purchasing the Future Receivables at a discount. Because the transaction evidenced by this Agreement is not a loan, there are no scheduled payments and no fixed repayment term." *See, e.g.*, *id.* The language of the Agreements evidences a clear intent by the parties to enter into a series of account purchase transactions and not loans.

Defendants argue that Plaintiff has made a "form-over-substance argument" and assert that the Court must consider "the totality of the circumstances." *See* Defs.' Br. Supp. Mot. Summ. J. 14, ECF No. 87. To ascertain the parties' intent, the Court will also address the "attending

11

circumstances." *See Korrody*, 126 S.W.3d at 226 (noting courts ascertain intention of parties "as disclosed by the contract, attending circumstances, or both").

The parties' business relationship supports a finding that the parties intended to enter into a series of account purchase transactions. Defendants' business relationship with Plaintiff began around May 2011 when Defendants approached Plaintiff seeking an advance. *See* Pl.'s App. Resp. Ex. G (Womack Decl.), App. at 53, ECF No. 120; *see also* Pl.'s App. Reply Ex. C (Shampansky May 2011 Emails), App. 34-37, ECF No. 129. Plaintiff "did not solicit or initiate contact with [Defendants] for the first agreement . . . ." *See* Pl.'s App. Resp. Ex. G (Womack Decl.), App. at 53; *see also* Pl.'s App. Reply Ex. D (Shampansky July 2011 Emails), App. at 39 ("[Plaintiff] really came through for us when we needed help and we greatly appreciate it.").

Throughout the business relationship, the parties engaged in arm's length transactions whereby Defendants sold a percentage of their future credit card receivables for a cash advance. During the negotiations, both parties were represented by counsel and Defendants have not asserted that they did not understand the substance of the Agreements or the parties' business relationship. *See* Pl.'s App. Resp. Ex. G (Womack Decl.), App. at 53-54; *id.* Ex. I (Fria Dep.), App. at 60-61. Handwritten changes appear throughout the Agreements, including the striking of the liquidated damages provision, and Margalith acknowledged that he initialed each page of the Agreements and the changes made. *See* Pl.'s App. Supp. Mot. Summ. J. Ex. A (Dec. 28, 2012 Agreement), App. 5-12; *id.* Ex. H (Margalith Dep.), App. at 72-74; *see also* Pl.'s App. Resp. Ex. G (Womack Decl.), App. at 54 ("Ultimately, [Plaintiff] accepted certain changes made by Defendants, which were applied to every Agreement."). The record also contains various emails between Plaintiff and Defendants negotiating the terms for "additional funding" for Defendants. *See* Pl.'s App. Reply Exs.

C-D (Shampansky Emails), App. 33-42 (discussing "various changes to the agreement agreed upon by the parties").  The record indicates that the business relationship involved experienced parties engaging in a series of arm's length transactions where both parties were aware of the substance of the Agreements.

The conduct of the parties after entering into the Agreements further shows that the parties intended to enter into a series of account purchase transactions.  The record shows that Defendants sought out the initial Agreement, Pl.'s App. Resp. Ex. G (Womack Decl.), App. at 53, and additional cash advances after entering into the first Agreement.  Pl.'s App. Reply Ex. D (Shampansky July 2011 Emails), App. at 39-41.  Plaintiff fully performed under the Agreements at issue by making payments to Defendants from December 2012 to July 2013.  *See* Pl.'s App. Resp. Ex. F (Fricke Decl.), App. at 49-50.  Defendants also performed without objecting to the terms of the Agreements until July 2013.  *See* Defs.' App. Supp. Mot. Summ. J. Ex. A (Margalith Decl.), App. at 6.

Between May 2011 and July 2013, the parties entered into ten Agreements.  Defendants paid off the first five Agreements in their entirety and only stopped paying Plaintiff after they were advised by their attorney that the Agreements were usurious loans, after Defendants received the final cash advance.  *See* Defs.' Br. Supp. Mot. Summ. J. 11-12, ECF No. 87; Pl.'s App. Reply Ex. B (Womack Dep.), App. at 17, ECF No. 129; *see also* Defs.' App. Supp. Mot. Summ. J. Ex. D (Expert Report), App. at 45, 53, ECF No. 88-1.  There is no indication in the record that Defendants believed that the Agreements were loans or that they were paying interest under the Agreements, until Defendants began to encounter financial trouble.  *See* Defs.' App. Supp. Mot. Summ. J. Ex. A (Margalith Decl.), App. at 6 (discussing Defendants' financial issues and stating Defendants were "advised" in July 2013 that the Agreements were illegal); *see also* Defs.' Br. Supp. Mot. Summ. J.

13

9, ECF No. 87 ("Recently, . . . [Defendants have] suffered financial distress due to the usurious interest rates that [Defendants have] been forced to pay [Plaintiff].").  Communications between the parties refer to "the factor rate," and Defendants' Chief Operating Officer, who was in charge of arranging the initial contracts with Plaintiff, told Plaintiff: "I know it's a factor and not an interest rate."  *See* Pl.'s App. Reply Ex. D (Shampansky July 2011 Emails), App. at 39.  The record indicates that until July 2013, Plaintiff and Defendants both viewed the Agreements as account purchase transactions that did not require Defendants to pay usurious interest.

Defendants focus on the recourse provisions in the Agreements in arguing that the Agreements were usurious loans.  *See* Defs.' Br. Supp. Mot. Summ. J. 17-19, ECF No. 87.  The parties' intent in entering into a financial arrangement is the most important consideration to determine whether a transaction is a sale of accounts receivable or a loan, *Korrody*, 126 S.W.3d at 226, and the presence of recourse provisions in the Agreements does not transform the arrangement into a loan because recourse provisions "vary from contract to contract."  *See Carter*, 97 S.W.3d at 397-98; *see also Korrody*, 126 S.W.3d at 227 (noting plaintiff "understood that standard procedures are not always followed when parties establish a factoring relationship").

The Court finds guidance from the Texas Business and Commerce Code, which also emphasizes the parties' intent and characterization of a transaction.  Chapter 9 of the Texas Business and Commerce Code states:

> The application of this chapter to the sale of accounts . . . is not to recharacterize that sale as a transaction to secure indebtedness but to protect purchasers of those assets by providing a notice filing system. For all purposes, in the absence of fraud or intentional misrepresentation, the parties' characterization of a transaction as a sale of such assets shall be conclusive that the transaction is a sale and not a secured transaction and that title . . . has passed to the party

14

> characterized as the purchaser of those assets regardless of whether
> the secured party has any recourse against the debtor . . . or any other
> term of the parties' agreement.

Tex. Bus. & Comm. Code § 9.109(e).  This provision is a "safe harbor" that allows parties to treat

a transfer of accounts as a sale "for all purposes if the parties express their intent for that result by

identifying transfers as sales . . . ."  *See id.* cmt. 2 (2011 Main Volume); *see also* Jonathan C. Lipson,

*Secrets and Liens: The End of Notice in Commercial Finance Law*, 21 Emory Bankr. Dev. J. 421,

467 n.192 (2005) ("Texas . . . simply added a new subsection to Article 9 . . . that left it up to the

parties involved in securitization transactions to classify the nature of transfers."); Eugene F. Cowell

III, *Texas Article 9 Amendments Provide "True Sale" Safe Harbor*, 115 Banking L.J. 699, 701

(1998) ("The purpose of this provision is to provide a statutory safe harbor for parties seeking

certainty that a transfer of accounts . . . will be treated as a sale—and not as a secured

transaction—even if the transaction involves a transfer of some but not all of the risks and benefits

of owning such assets.").

Likewise, the Texas Finance Code gives significant weight to the parties' intent and

characterization of a transaction.  *See Korrody*, 126 S.W.3d at 226.  Based on the language of the

Texas Finance Code, the presence of recourse provisions, including Plaintiff taking a security interest

in Defendants' property, does not make the Agreements loans because the parties characterized the

transactions as a series of account purchase transactions.  *See Worldwide Trucks*, 948 F.2d at 979

("Any doubt as to the legislative intent to punish the activity complained of is to be resolved in favor

of the defendant.") (citations omitted); *see also Allied Capital Partners, LP v. Proceed Tech. Res.,*

*Inc.*, 313 S.W.3d 460, 463 (Tex. App.—Dallas 2010, no pet.) (noting parties entered factoring

agreement where factor was granted security interest in "all of PTRI's existing and later arising

accounts and other assets as collateral").

Finally, the Agreements are missing several material terms that typically define a loan of money. "In a contract to loan money, the material terms will generally be: the amount to be loaned, maturity date of the loan, the interest rate, and the repayment terms." *T.O. Stanley Boot Co. v. Bank of El Paso*, 847 S.W.2d 218, 221 (Tex. 1992). The Agreements explicitly state: "Because this is not a loan, [Plaintiff] does not charge interest . . . or similar fees . . . . Because the transaction evidenced by this Agreement is not a loan, there are not scheduled payments and no fixed repayment term."[6] *See, e.g.*, Pl.'s App. Supp. Mot. Summ. J. Ex. A (Dec. 28, 2012 Agreement), App. at 6.

Defendants do not dispute that the amount owed never increases with time and that there is no maturity date. *See* Pl.'s App. Supp. Mot. Summ. J. Ex. A (Dec. 28, 2012 Agreement), App. at 6 ("The term of this Agreements is from the date [Plaintiff] pays the Purchase Price or a portion thereof to [Defendants] until the date that the entire Amount Sold has been remitted to and received by [Plaintiff]."); Pl.'s Resp. 6-7, ECF No. 119 ("[I]f Plaintiff does not receive another penny from Defendants over the next ten years, then Defendants will still owe $1,322,482.71 in 2024."); *see also* Tex. Fin. Code § 302.001(c) (stating interest rate is determined by looking at "the stated term of the loan"). It is also undisputed that the Agreements do not have scheduled payments or a fixed repayment term. *See* Pl.'s App. Supp. Mot. Summ. J. Ex. A (Dec. 28, 2012 Agreement), App. at 5.

Additionally, the record establishes that during the course of the business relationship, Defendants were not on a fixed payment schedule. *See* Pl.'s App. Resp. Ex. G (Womack Decl.),

---

[6] Defendants' expert witness created an imputed interest rate, but it is undisputed that the Agreements do not state an interest rate. *See* Defs.' App. Supp. Mot. Summ. J. Ex. D (Expert Report), App. at 44, ECF No. 88-1 (noting Agreements are missing interest rate and time for repayment, which are "contract terms typically found in loans"). Defendants' expert also fails to cite to the Texas Finance Code provision that identifies how interest rates are to be determined. *See* Tex. Fin. Code § 302.001(c).

App. at 54.   Pursuant to the Agreements, Defendants paid Plaintiff if Defendants' customers purchased Defendants' goods and services with credit cards, charge cards, debit cards, or prepaid cards.  *See, e.g.*, Pl.'s App. Supp. Mot. Summ. J. Ex. A (Dec. 28, 2012 Agreement), App. at 5-6. Defendants were not required to pay Plaintiff if Defendants did not create these "future accounts and contract rights," unless Defendants offered an incentive to their customers that "discourage[d] the use of credit cards, debit cards or other payment cards."  *See id.* at 5, 7; *see also* Pl.'s App. Resp. Ex. F (Fricke Decl.), App. at 50 ("Since [Plaintiff] only receives a percentage of receivables remitted, if a merchant's business slows and the amount of receivables created declines, [Plaintiff] will receive less receivables.   Conversely, if a merchant's business increases, [Plaintiff] will receive more receivables because more are being created.").  Defendants' payments were "wholly dependent" on the performance of its own business.  *See* Pl.'s App. Resp. Ex. F (Fricke Decl.), App. at 50.

In conclusion, the express language of the Agreements, the attendant circumstances, and the business relationship between the parties establishes that the parties intended the Agreements to constitute a series of account purchase transactions and not loans.   The Court finds that Plaintiff established that the Agreements were enforceable account purchase transactions and Defendants failed to carry their burden in establishing that the Agreements were usurious loans.

Because the Agreements constituted valid account purchase transactions, Defendants' usury defense and counterclaim lack merit and Plaintiff is entitled to summary judgment on its breach of contract claim.  *See supra* note 3.

### B.      Fraud and Fraudulent Inducement

Plaintiff also moved for summary judgment on its remaining claims for fraud and fraudulent

inducement.[7]  The essential elements of a fraud claim are: "(1) that a false, material representation was made; (2) that was either known to be false when made or was made without knowledge of its truth; (3) that was intended to be acted upon; (4) that was relied upon; and (5) that caused injury." *Hubbard v. Shankle*, 138 S.W.3d 474, 482-83 (Tex. App.—Fort Worth 2004, pet. denied) (citations omitted).  "Fraudulent inducement 'is a particular species of fraud that arises only in the context of a contract and requires the existence of a contract as part of its proof.'" *LeTourneau Techs. Drilling Sys., Inc. v. Nomac Drilling, LLC*, 676 F. Supp. 2d 534, 542 (S.D. Tex. 2009) (quoting *Haase v. Glazner*, 62 S.W.3d 795, 798-99 (Tex. 2001)).  To prove its fraudulent inducement claim, Plaintiff must establish the elements of fraud as they relate to the Agreements.  *Id.*

Pursuant to the Agreements, Defendants represented that: (1) the information and financial documents provided to Plaintiff were "true and correct and accurately reflect[ed] [Defendants'] financial condition"; (2) Defendants were in compliance "with all of [their] material contracts"; and (3) Defendants were not delinquent with any taxing authority.  Pl.'s Br. Supp. Mot. Summ. J. 14-15, 18-19, ECF No. 100 (quoting paragraph 7 of the Agreements).  Plaintiff contends that Defendants failed to disclose: (1) Defendants' lawsuit with its line of credit lender, (2) that Defendant's line of credit had changed to a promissory note, (3) "the permanently damaged relationship" between Defendants and their lender, and (4) the federal tax liens on Defendants' property.  *See id.* at 15, 18.

---

[7]  Plaintiff's promissory estoppel claim was pleaded alternatively in the event the Court found that the Agreements were not valid contracts.  *See* Pl.'s Br. Supp. Mot. Summ. J. 5, ECF No. 100; *see also City of Clinton, Ark. v. Pilgrim's Pride Corp.*, 654 F. Supp. 2d 536, 544 (N.D. Tex. 2009) (Means, J.) ("[I]f a valid contract between the parties covers the alleged promise, promissory estoppel is not applicable to that promise.  Instead, the wronged party must seek damages under the contract.") (citations omitted) (internal quotation marks omitted).  Plaintiff also filed an amended complaint and asserted additional causes of action for unjust enrichment and alter ego.  *See* Pl.'s Am. Compl. ¶¶ 29-33, 45-49, ECF No. 114.  These claims were not briefed by the parties and the Court expresses no opinion on the merits of these claims.

Plaintiff argues that it relied on these representations when it decided to purchase the future receivables and asserts that it would not have entered into the Agreements if it had been aware of Defendants' actual financial condition.  *See id.* at 16-17, 20.  In response, Defendants contend that despite Plaintiff's claims, Plaintiff relied on its own underwriting and due diligence processes when it decided to enter into the Agreements, and Defendants presented evidence that Plaintiff routinely advances money to businesses that have "had some stumbles."  *See* Defs.' Resp. 6-9, ECF No. 116.

The Court finds that there are genuine factual disputes regarding Plaintiff's reliance upon Defendants' representations.  Accordingly, summary judgment on Plaintiff's fraud and fraudulent inducement claims is inappropriate.  *See* Fed. R. Civ. P. 56(a).

## IV.   CONCLUSION

Based on the foregoing, the Court **DENIES** Defendants' Motion for Partial Summary Judgment (ECF No. 86).  The Court **GRANTS** Plaintiff's Amended Motion for Partial Summary Judgment (ECF No. 99) as to Plaintiff's breach of contract claim and **DENIES** Plaintiff's Amended Motion for Partial Summary Judgment as to Plaintiff's remaining claims.

**SO ORDERED** on this **24th day** of **June, 2014**.

Reed O'Connor
**UNITED STATES DISTRICT JUDGE**